**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KIMBERLY MARKEL,** | **CIVIL ACTION NO. 24-2143** |
| **PLAINTIFF,** | **COMPLAINT** |
| -- against -- | **JURY TRIAL DEMANDED** |
| **THE NEW SCHOOL,** | |
| **DEFENDANT.** | |

Plaintiff Kimberly Markel ("Plaintiff"), by and through her attorneys, The Fierberg National Law Group, PLLC, brings this action against The New School ("TNS" or the "University") and hereby alleges as follows:

## I. OVERVIEW

1.      Plaintiff is an award-winning artist, owner of a design studio, and a contingent faculty member at the University's Parsons School of Design, a coveted position in the design world. She joined the faculty of Parsons' School of Constructed Environments ("SCE" or "Department") in January 2020 to teach a required course for undergraduate students under the supervision of a full-time faculty member, Professor John Roe[1] ("Professor Roe"), who had been with the University since 2007.

2.      By the time Plaintiff joined the faculty in 2020, the University knew that Professor Roe, her new supervisor, had faced multiple complaints of harassment. He was well known within his Department as a serial sexual harasser. Professor Roe's conduct was so alarming, relentless,

---

[1] John Roe is a fictitious name. Professor Roe's true name is known to Defendant and may be provided to the Court or Defendant at any time.

and disturbing that the University had already been alerted to three students' concerns involving Professor Roe's misconduct when he initiated his scheme on Plaintiff in 2020. In response to these multiple concerns, TNS failed to take meaningful action to stop the misconduct, emboldening Professor Roe to continue his practices.

### *Since 2017, the University had Knowledge that Professor Roe Sexually Harassed Students*

3.      In 2017, upon information and belief, the University learned that a graduate student had raised concerns that Professor Roe was sexually harassing her. The Dean of the Department at the time, as well as the Program Director, were alerted to the misconduct. The Dean gave Professor Roe a "warning" about his failure to respect professional boundaries. Upon information and belief, the Dean's warning was informal, friendly, and in breach of the University policies and procedures and the law. Informal or otherwise, the "warning" did nothing to stop Professor Roe's predatorial behavior.

4.      In 2019 and 2020, the University was alerted to two more students' concerns with Professor Roe. Once again, upon information and belief, the University did nothing to investigate, address, or end the misconduct. Instead, the University blamed the students for not following up with the Title IX Office when the office purportedly attempted to contact them. The students' fear and hesitancy to pursue a complaint against a professor should not only have come as no surprise to the University, but it should have rung alarm bells that the students felt intimidated and scared and that the University's complaint mechanism was utterly inadequate.

5.      Once again, in or around late 2021 and early 2022, students turned to social media to post about Professor Roe's misconduct, if only to advise and warn others about his misconduct. While the University's Title IX Office was aware of these posts, upon information and belief, it

again did nothing either to investigate Professor Roe or, upon information and belief, to examine its policies, practices, and complaint mechanisms.

6.　　As a result, by the time Plaintiff met Professor Roe in 2020 and began reporting directly to him, she was wholly unaware of the numerous reports of misconduct known to the University, and by the time Plaintiff reported the harassment she endured to the Title IX Office in February 2022, the University once again employed its dangerous, longstanding do-nothing approach to Professor Roe's troubling pattern of abuse as a serial sexual harasser.

7.　　Similarly, given that Professor Roe had already received a "warning," he was also very well aware that his obsessive sexual pursuit of Plaintiff violated the University's prohibition on sexual harassment, as well as the University policy on amorous relationships. His pursuit of Plaintiff was therefore no simple mistake or momentary lapse of judgment. It was part of a scheme of grooming and sexual harassment that included troubling, stalking-like behaviors and abuse of power to which the University consistently, and knowingly, turned a blind eye.

8.　　Professor Roe was part of the Old Boys Network that not only tolerated sexual harassment but also served to protect and promote Professor Roe and bolster his long career. When Plaintiff arrived in 2020, there were no other full-time or tenured female faculty members in Professor Roe's program, only female contingent faculty, like Plaintiff, who had few, if any, benefits or job security, and struggled to make a living wage by working at TNS. TNS relies on its contingent faculty members, who are reported to constitute approximately ninety percent of all faculty, for survival. The power differential between a male full-time faculty member, like Professor Roe, and a female contingent faculty member, like Plaintiff, is significant.

9.　　The University's do-nothing approach and longstanding deliberate indifference -- and even outright hostility -- toward sexual harassment complainants was so deep-seated that when

Plaintiff reported Professor Roe in February 2022 to the University's Title IX/EEO Office, the University did nothing *for four months*. Instead, The University chose to wait for Plaintiff to follow up with more information, even as the University already had sufficient information on Professor Roe's misconduct and was aware of the profound risks Plaintiff took in coming forward against Professor Roe while he continued to supervise her work.

10.     By the close of the Spring 2022 semester, Plaintiff had obtained counsel and reached back out to the Title IX/EEO Office to submit extensive evidence of harassment, which finally prompted the University to take her complaint seriously and investigate.

11.     But two months later, the University made a public announcement that Professor Roe had been elevated to the Director of the Bachelor of Fine Arts ("BFA") Product Design Program. Dean David Lewis, the new dean, made an email announcement congratulating Professor Roe and expressing "great confidence" in him, sending a signal to Plaintiff, and to others who had come forward against Professor Roe, that her complaint was not being taken seriously.

### *Professor Roe Engaged in the Same Scheme of Sexual Harassment with Plaintiff as He Had with Other Women*

12.     For fifteen months, Plaintiff was subjected to the paralyzing, smothering, and claustrophobic mind games and manipulation of an experienced sexual harasser who used grooming techniques in targeting Plaintiff. Professor Roe engaged in stalking-like behavior and persistently harassed her, exchanging over 700 texts with her from early morning until after 9 p.m., demanding over a hundred hours of video calls with her, repeatedly inviting her alone to drinks, art shows and events, repeatedly inviting himself to her home, and even sending her a bouquet of tulips to her doorstep on her birthday.

13.     Throughout this time, Professor Roe did not expressly ask for sex or make lewd comments to Plaintiff, but his unwelcome intentions were unmistakable. As confirmation, when

Plaintiff could no longer withstand the toxic dynamic with Professor Roe and confronted him over a video call in March 2021, he cried and confessed his feelings for her.

14.     During this period, Plaintiff was unaware that she was just another victim in an ongoing scheme of serial sexual harassment. She assumed that Professor Roe had simply made a one-time error of judgment, which made her hesitant to come forward to the University. But as Plaintiff later learned, Professor Roe's tactics were well-honed and nearly identical to those he had been using with other victims, mainly his students at the University, for years – the gifts to the doorstep, the inappropriate invitations for a drink or to galleries to female subordinates, the incessant, smothering communications, and the intimidating stalking-like behavior.

15.     Plaintiff feared Professor Roe and felt that she had to placate him to avoid angering or upsetting him.

16.     On the heels of Plaintiff's 2022 complaint to the Title IX/EEO Office, another student victim came forward against Professor Roe. Both Plaintiff and the other victim's allegations of sexual harassment were ultimately substantiated at the conclusion of the University's investigation, and the University's findings were provided to Plaintiff in December 2022, *nearly a year after she made her initial complaint*, despite the years of knowledge that the University had about this individual's gender-based misconduct.

### *The University Permitted Professor Roe to Engage in Retaliatory and Quid Pro Quo Tactics against Plaintiff*

17.     Professor Roe served as the gatekeeper to Plaintiff's career at Parsons, one of the world's most prestigious institutions for design studies. When Plaintiff tolerated Professor Roe's sexual harassment, he opened doors for her at the University and in the field. His obsessive advocacy to work with Plaintiff, to spend more time with her, and to completely change a course's curriculum so he could co-teach with her should have set off alarm bells for the University,

particularly for Dean Kirkbride who had issued the warning. Instead, Dean Kirkbride rubber-stamped Professor Roe's requests.

18.     In contrast, once Plaintiff confronted Professor Roe about his sexual harassment, he retaliated by decreasing her workload, removing significant projects from her, and ceasing essentially all communication with her. These actions had an adverse impact on her ability to do her job during the Spring of 2022, following her complaint to the Title IX/EEO Office.

19.     In the face of so many complaints of misconduct against Professor Roe, the University should have immediately investigated the first sign of Professor Roe's sexual favoritism toward Plaintiff, followed by his retaliation. Instead, the University did nothing, and even after Plaintiff came forward in February 2022, it sat on its hands for four months before launching a protracted investigation.

20.     All told, it took five faculty and students to raise concerns about Professor Roe's misconduct for the University to take sufficient action. Accordingly, Plaintiff brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"); the New York Exec. Law § 296 *et seq.* ("NYSHRL"); N.Y.C. Admin. Code § 8-502(a) *et seq.* ("NYCHRL"); Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"); and New York common law.

## II.  THE PARTIES

23.     Plaintiff is a part-time faculty member at Parsons School of Design at The New School. At all relevant times, Plaintiff has been domiciled in New York State.

24.     Defendant The New School is a private university located in Manhattan, New York City, that, upon information and belief, receives federal funding. Defendant New School

has numerous undergraduate and graduate schools, one of which is Parsons School of Design, where Plaintiff worked.

### III. JURISDICTION AND VENUE

26. This Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1331 because this action involves claims brought under the federal civil rights statutes, Title VII and Title IX. This Court has supplemental jurisdiction over Plaintiff's claims under the New York City and State Human Rights Law and New York common law pursuant to 28 U.S.C. § 1367.

27. Plaintiff entered a tolling agreement with the University, tolling her employment discrimination claims and preserving the status quo, including, *inter alia,* her claims under Title VII of the Civil Rights Act of 1964 and the New York City and New York State Human Rights Laws, from October 14, 2022 up to and including November 28, 2022. She therefore timely filed a charge with the Equal Employment Opportunity Commission ("EEOC") on November 29, 2022.

28. Plaintiff received her right-to-sue letter from the EEOC on January 10, 2024.

29. Plaintiff will serve a copy of this action on the New York City Commission on Human Rights and Corporation Counsel of the City of New York within ten (10) days of commencing this action, pursuant to NYCHRL § 8-502(c).

30. Venue is proper in this District under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f). Defendant The New School is headquartered in this District. The unlawful workplace practices complained of in this complaint occurred in this District, as well as the events or omissions that gave rise to Plaintiff's claims.

### IV. FACTUAL ALLEGATIONS

#### A. Plaintiff Accepts a Position to Teach at The New School

31.     In the Fall of 2019, Assistant Professor Joel Stoehr, who was the new program director at that time, extended an invitation to the Plaintiff for an interview regarding a teaching position at Parsons. This role was highly sought after in the design industry, and eventually, the Plaintiff was selected for the position. Upon information and belief, it is believed that Professor Roe held considerable power and sway over the hiring process for the part-time faculty members who were under his supervision, and had a significant say in the Plaintiff's appointment

32.     The following semester, in the Spring of 2020, Plaintiff began teaching Design Studio 2 under Professor Roe, a required course for sophomores, along with three other part-time faculty, one of whom was male.

33.     While Plaintiff was eager to begin her career at Parsons, she was alarmed when Professor Roe texted her, before the start of the semester, that he had requested to share a classroom with her. Plaintiff grew very concerned about sharing a space with Professor Roe and texted him to explain that she would prefer not to, with the excuse that she would feel too uncomfortable as a new instructor. He replied with a sad-face emoji and backhandedly reproached her for not wanting to share a classroom with him, which made Plaintiff uncomfortable.

34.     Plaintiff would come to learn that Professor Roe would frequently use this tactic as a means to maintain access to her, dominate her time, and sexually harass her.

35.     Professor Roe's request to administrators to share a classroom with Plaintiff should have immediately alerted University administrators that Professor Roe was seeking significant access to a female subordinate, thus posing a danger to her.

**B.  Professor Roe Sexually Harasses Plaintiff in the Spring of 2020**

36.     Once courses started in the Spring of 2020, Professor Roe continued his obsessive, abusive pursuit of Plaintiff. He repeatedly asked her, alone, to drinks, but she relied on the excuse that she had to catch a train at Grand Central. He did not ask her male colleague to drinks. He sent her lists of activities he wanted the two of them to do together. Professor Roe was undeterred each time Plaintiff rebuffed his invitations. He would not accept no for an answer.

37.     Professor Roe exhibited troubling stalking-like behavior, memorizing Plaintiff's schedule. He would wait for her outside of her classroom before and after class. He would wait for her outside of the women's bathroom. Plaintiff began to take longer in the bathroom in an effort to avoid Professor Roe, sometimes for as long as 20 minutes, but he was undeterred and would continue to wait for her. He would follow Plaintiff to Grand Central by train to have time alone with her, which was the opposite direction of his home. She felt claustrophobic, fearful, and troubled that he was monitoring her every move.

38.     It was apparent that Professor Roe had an obsession with Plaintiff. She was relieved when she was no longer able to see him in-person on campus beginning in March 2020 due to the global COVID-19 pandemic and stay-at-home orders.

39.     However, that relief was short-lived: Professor Roe found ways to continue his pursuit of Plaintiff, exchanging over 700 texts with her from early morning until after 9 p.m., demanding over a hundred hours of video calls with her. He texted her with the unwelcome gesture that he was "thinking about [her]." In the text exchange below, he shared that he had a dream about her. When Plaintiff was not sufficiently effusive and warm in responding to his dream description, he made inappropriate backhanded comments: "Well obviously you aren't finding me funny and charming this evening, so . . ." :



40.    Plaintiff was afraid of Professor Roe. He was temperamental, volatile, and in a position of power over her, and she had seen him bully and act aggressively toward his students. Not only did Plaintiff have to endure constant sexual harassment, but she had to do so gracefully and with kindness or risk retaliation and escalating harassment, guilt-tripping, and more requests to talk by phone or to meet in person.

41.    Professor Roe was unwilling to take no for an answer, continuing his pursuit, telling Plaintiff, "I was in a good mood and thinking about you."

42.    A few days after that text exchange, Professor Roe sent flowers to Plaintiff's home for her birthday. He texted three times asking for her address for delivery until she relented and provided it to him, which she did not wish to do.

43.    On the morning of her birthday, Professor Roe texted Plaintiff to wish her a happy birthday and alert her to the flowers at her front door. When she thanked him, briefly, he responded,

"You're welcome! I wanted to do something to brighten up your birthday. Happy you like them, I was hoping you didn't have an allergy to tulips."

44.    Professor Roe continued the awkward exchange about the birthday flowers:



45.    Plaintiff felt nauseous upon receiving the flowers from Professor Roe and asked her mom to take them away. His text messages to her were intimate and casual, referring to Plaintiff's mother as "mom" and fantasizing about spending the day with her.

46.    But to keep her job, and to avoid angering Professor Roe, Plaintiff expressed gratitude and attempted to move on, citing migraines as the reason she wished to avoid phone and video calls with Professor Roe.

47.    However, Professor Roe was relentless in his obsessive pursuit of Plaintiff, and he continued his requests to talk by phone and video. Not long after sending the flowers, he wrote: "If you're feeling better maybe we could talk tomorrow. That'd be nice." He also continued his odd and repeated requests for a picture of the birthday flowers he sent her: "send me a photo of

them and let's talk soon"; and again a short time later, "send me a photo of the flowers, it's stupid but I'd like to see them."

48.     As a result of the sexual harassment, she faced in her first semester at the University, Plaintiff sought treatment from her primary care physician. In or around the Spring of 2020, she was prescribed Xanax, Paxil, and an SSRI for her increased anxiety, and Imitrex, for increasingly frequent debilitating migraines due to the gender-based harassment she was facing.

### C. Professor Roe Continues Harassing Plaintiff in the Summer and Fall of 2020

49.     In the late spring of 2020, Professor Roe began planning the next academic year and leveraging his significant authority in the Department to have more co-teaching opportunities with Plaintiff. He proposed to co-teach the "Build Your Own Factory" ("BYOF") elective course with her for the following year, in the Spring 2021 semester. Not only did he propose to then-Dean Kirkbride that they co-teach, but he completely redesigned the course, one specifically tailored to Plaintiff's unique expertise, to justify to Dean Kirkbride the opportunity to co-teach with her.

50.     While Plaintiff was wary of spending more time with Professor Roe, she was thrilled by the opportunity to do more teaching, build her resume, and most significantly, accumulate a sufficient number of credits to be eligible for University health insurance, retirement benefits, and free tuition for a master's degree. Professor Roe specifically dangled the added benefit of health insurance as a carrot in his proposition to Plaintiff that she co-teach BYOF with him.

51.     Plaintiff came to Parsons to advance her career while running a successful and growing design business of her own. Plaintiff had reached a level of stardom in the design world and was determined to continue excelling. Professor Roe was well aware of Plaintiff's ambitions, even commenting on changes to her personal website almost immediately after she made changes

to it, once again indicating to her that he was following her every move, and used business and teaching opportunities as a means to sexually harass, pursue, and exercise power over Plaintiff.

52. In July 2020, Professor Roe forwarded Plaintiff an interesting opportunity to work with the Korres brand for a recycling project similar to one she had done previously for another brand, again repeatedly requesting to speak with her by phone about it. She was well qualified and eager for the opportunity, got in touch with Korres, and had a very positive meeting with them. As a business owner, she was eager for the opportunity to work with another major, global brand that she admired.

53. Even while Plaintiff was not teaching in the summer and throughout the fall of 2020, Professor Roe continued to monopolize Plaintiff's time by phone, speaking with her for anywhere from an hour to two to three hours at a time. While some of that time was dedicated to work discussions, Professor Roe also used that time for intense personal discussions. But it was never enough: Professor Roe chastised Plaintiff for not speaking with him by phone and for not answering his calls, telling her that when she does not answer, it "puts him in a really bad place" and "really affects his mood and day."

54. The implication when Professor Roe made these statements, which he continued to make in 2021, was that he would harm himself or do something dangerous if he could not talk to Plaintiff. If he considered the call too short, he would follow up with a text "I thought we'd talk for longer" and tell her that he would "prefer in person."

55. In the Winter of 2020, Professor Roe's father passed away. Once again, he inappropriately relied on Plaintiff to help him manage his grief by frequent and lengthy phone calls. He also took advantage of Plaintiff's sympathy knowing that her father had tragically passed away over a decade before.

### D. Professor Roe Escalates His Sexual Harassment of Plaintiff in the Spring 2021 Semester

56.     Just as he had in the Winter of 2019, right before Plaintiff began teaching at Parsons, Professor Roe requested that they share a Zoom classroom for the Design Studio 2 required course at the beginning of the Spring 2021 semester, telling her he did not feel that he could handle the first few classes alone. Plaintiff obliged, but he then expected her to share a classroom with him for the remainder of the semester, amounting to over 90 hours of studio time on Zoom with him, plus approximately 30 hours of prep time together. He would consistently ask her to stay after class meetings to talk one-on-one, which was physically and emotionally debilitating for Plaintiff.

57.     Plaintiff also began to teach BYOF with Professor Roe for the spring semester of 2021 for one-quarter of the time – and Parsons paid Plaintiff for only a quarter of the credits. However, the part-time role soon turned into full-time, as Professor Roe expected Plaintiff to attend and plan for every single class, which ultimately entailed over 75 hours on Zoom with Professor Roe, instead of only 10-20 hours. Plaintiff was never compensated for the additional time.

58.     Professor Roe enjoyed the extra time with Plaintiff, texting her that he was "enjoying nothing more right now than teaching with you, working together, and our chats. :)":

59.     The excessive hours over Zoom were still not enough for Professor Roe as he wanted to see Plaintiff in person at any chance. He continued to ask her to visit in person.

60.     In late January 2021, Plaintiff had a major business project with Nespresso in Soho. Professor Roe repeatedly asked to come see her during the installation. She told him not to come to the installation, as this was a project for her business and access was limited to the public due to Covid restrictions. He expressed disappointment, indicating that he was planning to surprise

her, inappropriately, with a gift. Despite her firm "no," he showed up anyway and Plaintiff asked her assistant not to leave her alone with him. Plaintiff did not feel safe alone around him.

61.     Later that day, he texted her, "It was a nice surprise to see you today." Plaintiff was distraught by the unexpected presence of Professor Roe outside of her workplace, and his inappropriate behavior was now visibly interfering with her outside business.

62.     Separately, in late January or early February 2021, when Plaintiff was filming an advertisement with Nespresso and had to show up late to a meeting that was scheduled outside of class time, Professor Roe excused her lateness and texted her, "You might have been late but you look really good! 😊" In an effort to use humor to diffuse his inappropriate advance, Plaintiff responded that "a professional made me look this way" (i.e. she had someone to do her hair and makeup), to which Professor Roe responded, "The professional had a great starting point." Plaintiff felt disgusted.

63.     On Valentine's Day, Professor Roe called her, but when she did not answer, he texted her to let her know he just wanted to chat and wish her a Happy Valentine's Day.

64.     The next evening, after typical work hours, Professor Roe texted her again, requesting to chat, writing, "Checking in to see how your day is and if you wanted to talk today?" Professor Roe suggested Zoom, purportedly to review materials for the BYOF course they were co-teaching. When Plaintiff requested that they speak by phone only, Professor Roe sniped, "sure, don't want to look at me."

65.     The call that evening lasted for 98 minutes. A week later, Professor Roe kept Plaintiff on the phone for 85 minutes, and the next week, 65 minutes, on top of many hours on video calls after classes. He texted her at all hours of the day, starting from early in the morning until after 9 p.m.

66. Professor Roe repeatedly asked Plaintiff for photos from her life. During video calls, he sometimes took photos of Plaintiff without her permission. Over a video call, Professor Roe requested a video tour of Plaintiff's bedroom, which he knew was the only space she had to conduct video calls. During his requests to come visit Plaintiff upstate, he would tell her, "I want to see where you Zoom from," meaning her bedroom. Plaintiff felt disgusted every time he made this request.

67. By the middle of the Spring 2021 semester, Plaintiff was physically struggling to manage the stress of Professor Roe's relentless, obsessive sexual harassment. At this point, she was encountering regular occurrences of migraines, TMJ disorder, sleeplessness, unease, and teeth grinding. She was spending over ten hours per week on video calls with Professor Roe.

68. On March 1, 2021, Plaintiff visited her dentist, who prescribed a mouth guard and a neurologist who gave her Botox injections in her jaw to treat the TMJ symptoms and migraines. Around this time, her primary care physician noted her insomnia from "work stress" and took note of her complaint that she once or twice per month, she experienced a sensation as if her throat were closing and she were choking.

69. By March 2021, Professor Roe appeared elated that he was spending so much time with Plaintiff, sometimes as much as 20 hours per week on video or phone calls. He was jovial almost every time he talked to Plaintiff. For instance, on March 20, 2021, Professor Roe texted Plaintiff, "Maybe you need an adventure"; "time for us to do some research." In those texts, he compliments Plaintiff's new website, which had only been up for a day, indicating that he was actively keeping tabs on her life outside of work.

### E. Plaintiff Reaches a Breaking Point and Confronts Professor Roe about Sexual Harassment

70.     Finally, on March 21, 2021, Professor Roe's sexual harassment came to a head. In an email he sent on March 21, 2021, Professor Roe, apparently emboldened by how much time he was spending with Plaintiff, made his move to escalate his relationship with her, stating: "Sometimes I don't know what I should tell you and what I shouldn't . . . Coming up and working with you has been something I've looked forward to before my father passed away. Since then it's been more important to me. In my head it's been the thing to do that'll get me motivated. It's also about spending the day with you. I've never had anything but a great day with you." Plaintiff felt repulsed.

71.     Later that evening, not having yet heard from Plaintiff, he followed up his perturbing email with a string of anxious text messages, informing Plaintiff that he was "getting the vaccine this week on Wednesday if that matters," as if the vaccine were the only issue worrying Plaintiff about Professor Roe's repeated requests to visit to her. In the email, he went on to tell her that that he felt he had more of a "friendship" with her than just a "professional relationship."

72.     Plaintiff had reached her breaking point with Professor Roe. Plaintiff's father passed away when she was young. Professor Roe was well aware of this sensitive fact and appeared to be exploiting it, pulling at her feelings of guilt and responsibility for her father's tragic death, a tactic he also used to have Plaintiff teach every single BYOF course, instead of only a quarter of the courses. She responded to his email as professionally as possible, writing that he should speak with a grief counselor or therapist to manage his feelings about his father.

73.     In an effort to end his sexual advances, Plaintiff closed the email by saying, "I am grateful for our professional relationship and hope that we can continue to maintain that," meaning that she did not wish to be more than colleagues.

74.     Upon sending the email, Plaintiff began having a panic attack and texted her mom for help. While Plaintiff had pushed off Professor Roe's escalating romantic advances for over a year out of fear of retaliation and losing her job, it was clear she could no longer avoid the issue.

75.     Two days later, Professor Roe once again asked Plaintiff to stay after class on Zoom, employing his frequent tactic of cornering Plaintiff, dominating her free time, and flirting with her. Plaintiff instantly began panicking. During that video meeting, she almost immediately broke down crying and confronted Professor Roe, explaining that she was incredibly stressed out and uncomfortable with his behavior. She told him how unfair it was for him to put her in this position and that she sensed he wanted to be "more than colleagues and more than friends," which was unacceptable to her. She made clear that he was in a position of power over her, which made it difficult for her to say no to his romantic advances.

76.     Professor Roe began crying and admitted to wanting a romantic relationship with Plaintiff. In response to Plaintiff's expressed concerns about his power over her, he conceded that while he did not have control over her job at the University, he had influence over it.

77.     After the call, Plaintiff had a panic attack and vomited.

78.     While Professor Roe relented and cooled his pursuit of Plaintiff for a few weeks, he slowly started testing the waters again, making every excuse to visit her upstate, including by purchasing a large piece of machinery from Plaintiff, which was more readily available on e-Bay and for less money. Plaintiff ultimately relented and allowed Professor Roe to make the purchase and to come upstate to take the heavy machine, stipulating that his friend had to accompany him to help, so they would not be alone together. Plaintiff was perturbed that Professor Roe made such an extreme effort to visit her, even after their confrontation. She felt fearful and anxious about the

visit, carefully orchestrating the visit so that her mother would be in the same location the entire time.

79.     At the end of April 2022, Professor Roe also sent her a birthday gift and continued to text her. Plaintiff felt distressed and disgusted, concerned that Professor Roe was unable to leave her alone and that he would pursue her at every available opportunity. Despite her clear rejection of him, Professor Roe's relentless pursuit of Plaintiff continued to manifest itself in their conversations and text messages over the following months.

### F.  Plaintiff Learns that Professor Roe is a Known Serial Harasser and that Gender-Based Harassment is a Problem within the Department

80.     In June 2021, for the first time, Plaintiff spoke to another colleague about her experience with Professor Roe, who indicated to her that she was not his first victim and that the leadership in the Department was aware of his behavior. Plaintiff was devastated to learn that leadership had knowledge and failed to do anything to stop Professor Roe and to prevent or correct the harm she suffered.

81.     Specifically, she learned that the dean and the program director of the Department both knew of Professor Roe's longstanding harassing behavior toward female students and more junior faculty members, including a 2017 complaint made by a graduate student that the Dean unilaterally decided to handle informally, in a friendly manner and, upon information and belief, without involving the Title IX/EEO Office as required.

82.     She also learned that sexual harassment complaints against another male, full-time professor were handled informally, or not at all, and that the Department took a discriminatory and harmful "informal" approach to complaints of sexual harassment.

### G.  Professor Roe Retaliates against Plaintiff at the Next Opportunity

83. By the Fall of 2021, Plaintiff had largely limited her contact with Professor Roe, as she was not teaching at the University that semester. However, throughout the semester, Plaintiff was concerned that her clear rejection of Professor Roe would have implications for her work environment and course load in the Spring 2022 semester.

84. Plaintiff's fears proved correct. On December 17, 2021, Plaintiff received a new appointment letter for the Spring 2022 semester, but that letter was missing the "Build Your Own Factory" class that she had spent countless hours planning and teaching with Professor Roe in the Spring of 2021 and had been promised for the Spring of 2022.

85. This had enormous consequences for Plaintiff, as she would not be able to obtain University health coverage, University retirement contributions of ten percent per year, or to receive tuition assistance to pursue a master's degree as she had planned. Had she taught BYOF in the Spring semester of 2022, as Professor Roe had promised her, Plaintiff would have had enough teaching credits to obtain a two-year master's degree from Parsons for free. All the time and effort she had put into the Spring of 2021 class had gone to waste as a result of refusing Professor Roe's advances and lodging a complaint to him about his misconduct.

86. On December 20, 2021, Professor Roe had a video call with all four of the instructors for the Design Studio 2 course in preparation for the Spring of 2022 semester and, as usual, asked only Plaintiff to stay on the call at the end.

87. During that private Zoom meeting, Professor Roe again started sexually harassing and flirting with her and asked Plaintiff if he could come "play in her garage" (i.e. visit her in her Hudson Valley studio), which was a phrase he had used on several occasions to flirt with her and immediately offended and disgusted Plaintiff. She did not want him in her garage, and she did not

want to "play" with him, a term she felt was loaded, offensive, and degrading of her work and time.

88.     During the call, Plaintiff not only rejected Professor Roe's flirtatious advances outright but confronted him over her concerns with her reduced course load and her suspicion that he had removed from teaching BYOF because she told him to stop sexually harassing her.

89.     Professor Roe snapped at her and said, "are you even going to be able to be professional anymore?" and "I am worried about you teaching next semester," effectively threatening to end her job at the University altogether. During the conversation, he became increasingly frustrated, gritted his teeth, rose from his seat, and stormed away from the computer in a fit of anger. After a brief break, he returned to continue the discussion. A few weeks later, Professor Roe disparaged Plaintiff and told Plaintiff's senior colleague that he was the only reason Plaintiff had gotten hired to teach at the University.

90.     After the call, Plaintiff quickly reached out to the University ombudsman for assistance, concerned about her employment and further retaliation from Professor Roe. Unfortunately, she did not receive timely assistance.

91.     Upon information and belief, the University never meaningfully investigated Plaintiff's allegations pertaining to Professor Roe's quid pro quo harassment and retaliation against Plaintiff, as such an investigation would implicate the senior leadership in the Department.

### H. Professor Roe Wields Significant Authority within the Department and is a Key Player in the Adverse Employment Actions against Plaintiff

92.     The following day, Professor Roe sent a lengthy email to Plaintiff, defensively explaining to her that things were apparently not as they appeared. Professor Roe told her that while he had asked Dean David Lewis to co-teach with her, his request was not granted, attaching his previous emails to Dean Lewis as purported evidence that he had in fact done so.

93.     However, his emails instead brought to light that Professor Roe had gone out of his way, *after* the spring semester of 2022 course catalog had been released, to reduce the enrollment for the BYOF course, from 24 as the spring before to 15 students, thereby obviating any business need to have Plaintiff co-teach with him at all.

94.     As a result, in the attached November 5, 2021 response, Dean Lewis emailed Professor Roe: "Following our conversation, it seems best to move forward with you teaching 100% but with the reduced class size." In other words, Plaintiff's workload was reduced because of Professor Roe's decision to reduce the course load, when the prior year he had advocated not only to increase it, but to fundamentally alter the curriculum to include Plaintiff as co-teacher. Departmental leadership failed to question Professor Roe's suspicious and belated change to the curriculum, which should have raised concerns, and failed to speak with Plaintiff at all about the drastic and consequential change to her workload.

95.     It was obvious to Plaintiff that had she accepted his advances, Professor Roe would not have pushed to reduce the class size and would have engaged in strong advocacy to have her co-teach and to advocate for other opportunities, just as he had at every previous opportunity.

96.     Professor Roe wielded significant power and influence over Departmental leadership, including Dean Lewis and the former Dean Kirkbride, who both effectively rubber-stamped his gender-biased teaching requests, even in the face of Professor Roe's known history of harassment of female students and faculty.

97.     Professor Roe repeatedly held himself out as Plaintiff's supervisor, as well as the supervisor for the three other part-time faculty members, and Plaintiff understood Professor Roe to be her supervisor.

98. As evidence of Professor Roe's authority in the Department, earlier in 2021, Professor Roe was invited to apply for the Deanship as Dean Kirkbride stepped down from the role. Upon information and belief, the outgoing Dean invited or encouraged him to apply for the position, despite having knowledge about student complaints against him and despite having been the one to issue Professor Roe a warning about respecting professional boundaries in 2017.

99. Professor Roe was good friends with the Department's full-time faculty and benefitted from and helped maintain the "Old Boys Club" and network.

100. While Professor Roe did not ultimately receive the position, he was encouraged to apply again to the three-year position, which revolves among full-time faculty. Furthermore, in the Summer of 2022, while Plaintiff's Title IX investigation was underway, he was promoted to Program Director for the Department.

### I. Plaintiff Complains to the Title IX/EEO Office, but the University Does Nothing for Months as Professor Roe Continues Retaliating Against Plaintiff

101. By January 2022, Plaintiff had still not signed the reappointment letter, as she had been trying to renegotiate and resume teaching BYOF in the Spring of 2022. On January 3, 2022, Plaintiff received another request for her signature on appointment letter from the University, which did not include the BYOF course. Plaintiff's efforts to renegotiate had not succeeded. She ultimately signed the letter out of fear for losing her job entirely.

102. Plaintiff met with the Title IX/EEO Office in February 2022 to report Professor Roe's gender-based misconduct.

103. When Rhonnie Jaus, Vice President for Equal Employment Opportunity, Affirmative Action, and Compliance, and Title IX Coordinator, and Gene Puno-DeLeon, the University Associate Director of Title IX/EEO, interviewed Plaintiff in February 2022, Plaintiff provided a summary of the sexual harassment she experienced, including that Professor Roe had

sent her flowers to her home on her birthday, repeatedly asked her to drinks, followed her to Grand Central Terminal, and frequently told her that seeing her was the best part of his day.

104.    Plaintiff also reported to the Title IX/EEO Office that Professor Roe had punished her and retaliated against her for rejecting his romantic advances by reducing her teaching course load in the Spring of 2022, which had significant ramifications for her ability to receive healthcare and retirement benefits through the University, as well as free tuition for a master's degree, which she wished to pursue.

105.    During the February 2022 meeting that took place over video, Ms. Jaus indicated that was not surprised by her complaint against Professor Roe, since her office had been monitoring Professor Roe as a result of troubling social media postings about him from students.

106.    When Plaintiff indicated to Ms. Jaus that she had also learned that a graduate student reported Professor Roe's gender-based misconduct to the Dean in or around 2017 or 2018, Ms. Jaus bristled and expressed shock. Instead of believing Plaintiff, Ms. Jaus told her she had known the Dean for a long time and rejected the notion outright that he had knowledge of any prior complaints against Professor Roe. However, given the results of the University's investigation in response to Plaintiff's EEOC Charge, Ms. Jaus, despite her position of authority, did not appear to have accurate and crucial information about the systemic gender discrimination issues in Plaintiff's Department.

107.    At the time of the February 2022 interview, Plaintiff was unsure how to proceed with the complaint process, given that she was still working directly under Professor Roe's supervision. In addition, Plaintiff was also being considered for a prestigious teaching opportunity at a different university and worried that being embroiled in a Title IX process would negatively impact her candidacy. As a result, she waited to follow up with the University's Title IX/EEO

Office until the end of the semester, as was her right and as was appropriate given what she had learned from her colleagues about the University's failures to take prompt, corrective action against Professor Roe.

108.    As Plaintiff weighed how to proceed with her complaint against Professor Roe, the University took no meaningful steps to prevent Professor Roe's retaliatory conduct against Plaintiff, let alone to investigate, sanction, or train Professor Roe or the Department on sexual harassment and retaliation, as the University was required to do under its own policies and the law.

109.    Section XIII, "The Reporting Process," of the University's Harassment Policy states: "Regardless of whether a complainant files a complaint or requests action, if the University has notice of discrimination or harassment, as outlined in this policy, a prompt, thorough and impartial investigation of the allegations will be commenced."

110.    From at least February 2022 until June 2022, the University failed to take such action and follow its own policies.

111.    As a result, under the Title IX/EEO Office's watch, Plaintiff continued to face blatant discriminatory and retaliatory treatment on the basis of gender from Professor Roe for the entirety of the Spring 2022 semester.

112.    During that semester, as Plaintiff's colleagues noticed, Professor Roe had stopped speaking with Plaintiff, making any eye contact with her, or responding to her inquiries about her classes, which made it difficult for Plaintiff to do her job. Her colleagues took notice of the differential treatment she was receiving, which was shocking in light of Professor Roe's extensive prior contact with her.

113.    Plaintiff also learned that Professor Roe had quietly removed Plaintiff from the Korres project, a collaboration between the skincare brand Korres and the Parsons School of

Design. As a result, Plaintiff lost a major business and career opportunity. The project received positive press in May 2022, but Plaintiff was left out of the press and the crucial opportunity to build her portfolio and book of business. Finally, Plaintiff's name and biography were also removed from the University's website listing faculty members, impacting career, reputation, and networking opportunities. Despite numerous requests to fix this issue and Plaintiff's concern that her removal from the website was retaliatory, the University has still failed to do so, with the excuse that it was only an "administrative oversight." To the contrary, this "oversight" is symptomatic of the University's hostility toward female Title IX complainants and its unwillingness to take swift action to remedy harm.

114.    In late May 2022, at the conclusion of the semester, Plaintiff reached out again to the Title IX/EEO Office to pursue her complaint formally. Ms. Jaus and Mr. Puno-DeLeon met with her against on June 2, 2022 and purportedly promptly launched their investigation.

115.    However, on or about July 21, 2022, Dean Lewis announced that Professor Roe had been elevated to the Director of the Bachelor of Fine Arts ("BFA") Product Design Program, effective July 1, 2022, several months after Plaintiff's initial interview with the Title IX/EEO Office and two months after her follow up outreach to the office. To add insult to injury, Dean Lewis's email announcement congratulated Professor Roe and expressed "great confidence" in him, sending a signal to Plaintiff – and to other victims – that her complaint was not being taken seriously.

116.    During Plaintiff's pending Title IX investigation, the Department had deliberately elevated a known harasser into a position with significant oversight, particularly over undergraduate students.

117.    A few weeks later, some faculty members were notified that Professor Roe had gone on an unexpected leave of absence. However, the reason for his leave was undisclosed. The last public communication from the University about Professor Roe was one expressing "great confidence."

### J.  Professor Roe is Found Responsible for Breaching University Policy and Sexually Harassing Plaintiff and a Student

118.    In late December 2022, eleven months after Plaintiff's initial complaint, and seven months after her June 2022 follow-up complaint, Plaintiff finally received the University's outcome letter, informing her that the University had found Professor Roe responsible, by a preponderance of the evidence, for sexual harassment in violation of the Policy and for violating the Prohibited Relationships section of the Policy, but not for retaliation for reducing her workload.

119.    Upon information and belief, despite the protracted and untimely investigation, the University failed to conduct a meaningful investigation into Professor Roe's retaliatory conduct, in part because a finding of retaliation against Professor Roe could implicate the University, including Departmental leadership, and expose the University to far greater liability.

120.    The outcome letter stated: "We have forwarded our investigative report to the Executive Dean of Parsons, along with our recommendations, to ensure that this conduct does not happen again." However, at no time did the Title IX/EEO Office indicate how it would keep Plaintiff safe from further sexual harassment or retaliation or address past harm to her.

121.    Furthermore, at no time did the Title IX/EEO Office provide Plaintiff a notice of allegations, indicate under which set of policies Professor Roe was being investigated, whether under Title IX or the non-Title IX sexual harassment policies, leaving Plaintiff in the dark about her rights or the process throughout the entirety of the proceedings.

### K.  Plaintiff Suffers Physical, Emotional, Reputational, and Financial Harms

122. The University's actions created and worsened the condition of Plaintiff's working environment, subjecting her to a hostile work environment that ultimately led to the quid pro quo harassment and retaliation she faced.

123. As a result of Professor Roe and the University's conduct, Plaintiff suffered, suffers, and will continue to suffer extensive physical and psychological injuries, including:

      a. Extreme jaw pain;

      b. Migraines

      c. Sensations of choking and trouble swallowing;

      d. Changes to her reproductive health;

      e. Sense of shame, betrayal, and guilt;

      f. Difficulty forming intimate relationships;

      g. Extreme anxiety and Post-Traumatic Stress Disorder;

      h. Feelings of despair and hopelessness.

124. Plaintiff's physical symptoms were so severe that throughout her time working with Professor Roe, she sought medical treatment from her primary care physician to address her work stress and the sensation that she was choking and unable to swallow. She sought treatment from her neurologist for her migraines and from her dentist for jaw pain.

125. In February 2022, Plaintiff was diagnosed with Post-Traumatic Stress Disorder by her therapist for the sexual harassment she faced at work.

## V. COUNTS

**COUNT I**
**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW –**
**GENDER DISCRIMINATION AND HOSTILE WORK ENVIRONMENT**

126. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

127. Plaintiff is a contingent (or part-time) faculty member and female employee of the University.

128. At all times relevant to this claim, Professor Roe served as a fulltime faculty member and representative of the University, holding a position of authority or oversight over the Plaintiff. Professor Roe possessed the ability to modify the terms and circumstances of the Plaintiff's employment and educational setting, and actively exercised this authority.

129. Plaintiff was exposed to unwelcome conduct based on gender by Professor Roe and Defendant and was treated unfavorably compared to other employees because of her gender. This mistreatment included ongoing sexual harassment and retaliatory actions when the Plaintiff rejected Professor Roe's advances. The Defendant has violated the New York City Human Rights Law by discriminating against the Plaintiff in the terms, conditions, or benefits of her employment.

130. Given the continuous nature of the Defendant's discriminatory, gender-biased manner that Defendant treated Plaintiff, the continuing violation doctrine applies to the unlawful acts alleged in connection with this claim.

131. As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost future employment, reputational harm, humiliation, embarrassment, physical injury, emotional and physical distress, mental anguish, and other economic damages, and non-economic damages.

132. Defendant acted willfully, with negligence or reckless indifference to plaintiff's rights, entitling her to an award of punitive damages.

133.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory and emotional distress damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

### <u>COUNT II</u>
### VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW – RETALIATION

134.     Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

135.     Plaintiff engaged in protected activity when, among other things, she reported to Professor Roe that he was sexually harassing her and that he had retaliated against her, as well as each time she reported Professor Roe to the Title IX/EEO Office.

136.     Defendant was aware of the protected activity in which Plaintiff engaged because, *inter alia,* Plaintiff reported his conduct to the Title IX/EEO Office and because senior Department administrators, including deans and program directors of the Department, knew or should have known that Professor Roe was engaging in gender-based misconduct because of numerous prior complaints, but failed to act.

137.     As a result, Defendant engaged in conduct that had a chilling effect and was reasonably likely to deter a person from engaging in the protected activity, including by: reducing her workload, pay, and access to benefits, by removing her from an outside brand partnership, by removing her from Defendant's website, by promoting Plaintiff's harasser during the course of the Title IX investigation, by failing to address, train, supervise, monitor, discipline, and sanction Plaintiff's harasser in a timely manner, by taking far more than the 120 days recommended by the University's own policies to investigate, and by otherwise failing to conduct a prompt, timely, and

thorough investigation into all of Plaintiff's allegations of misconduct, including with respect to the retaliation she faced.

138.    Retaliatory animus was the motivating factor in Defendant's actions.

139.    As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost future employment, reputational harm, humiliation, embarrassment, physical injury, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

140.    Defendant acted willfully, with negligence or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

141.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory and emotional distress damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## COUNT III
### VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW --
### GENDER DISCRIMINATION AND HOSTILE WORK ENVIRONMENT

142.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

143.    Plaintiff is a part-time faculty member and female employee of the University.

144.    Defendant has subjected Plaintiff to differential treatment and to inferior terms, conditions, or privileges of employment in violation of the New York State Human Rights Law on the basis of her gender by subjecting her to a hostile work environment, an ongoing scheme of sexual harassment, quid pro quo harassment, and retaliation.

145.     At all times relevant to this claim, Professor Roe was a full-time faculty member and agent of Defendant who exercised managerial or supervisory authority over Plaintiff. The Defendant is therefore strictly liable for his conduct.

146.     Given the continuous nature of the Defendant's discriminatory, gender-biased manner that Defendant treated Plaintiff, the continuing violation doctrine applies to the unlawful acts alleged in connection with this claim.

147.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe anguish and physical and emotional distress, for which she is entitled to an award of monetary damages and other relief.

148.     Defendant's unlawful and discriminatory acts were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL, entitling Plaintiff to an award of punitive damages.

149.     Therefore, as a result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law, including back pay, front pay, pre- and post-judgment interest, compensatory and emotional distress damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

### COUNT IV
### VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW -- RETALIATION

150.     Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

151. Plaintiff engaged in protected activity when, among other things, she reported to Professor Roe that he was sexually harassing her and that he had retaliated against her, as well as each time she reported Professor Roe to the Title IX/EEO Office.

152. Defendant was aware of the protected activity in which Plaintiff engaged because Plaintiff, *inter alia,* reported his conduct to the Title IX/EEO Office and because senior Department administrators, including deans and program directors of the Department, knew or should have known that Professor Roe was engaging in gender-based misconduct, but failed to act.

153. Plaintiff suffered adverse actions based on engaging in protected activity.

154. Defendant unlawfully retaliated against Plaintiff in the terms and conditions of her employment on the basis of her protected activities, in violation of NYSHR § 296(1), including by: reducing her workload, pay, and access to benefits, by removing her from an outside brand partnership, by removing her from Defendant's website, by promoting Plaintiff's harasser during the course of the Title IX investigation, by failing to address, train, supervise, monitor, discipline, and sanction Plaintiff's harasser in a timely manner, by taking far more than the 120 days recommended by the University's own policies to investigate, and by otherwise failing to conduct a prompt, timely, and thorough investigation into all of Plaintiff's allegations of misconduct, including with respect to the retaliation she faced.

155. Defendant's unlawful and discriminatory acts were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL, entitling Plaintiff to an award of punitive damages.

156. As a result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the NYSHRL, including back pay, front pay, compensatory damages,

punitive damages, pre- and post-judgment interest, attorneys' fees, costs and disbursements and other appropriate relief.

## COUNT V
## VIOLATION OF TITLE VII – HOSTILE WORK ENVIRONMENT

157.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

158.    Plaintiff is a female part-time faculty member at the University and was subjected to harassment because of her gender that was so severe or pervasive as to alter the conditions of her employment.

159.    The employment environment was objectively hostile and permeated with intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.

160.    Plaintiff subjectively perceived her working environment to be hostile or abusive.

161.    Defendant is liable because the harasser was Plaintiff's supervisor whose input decision-makers relied on to take tangible employment action against Plaintiff.

162.    Defendant is also liable because of its own negligence where it failed to provide a reasonable and effective complaint mechanism and where it knew or should have known about the hostile work environment but failed to take appropriate remedial action.

163.    Given the continuous nature of the Defendant's discriminatory, gender-biased manner that Defendant treated Plaintiff, the continuing violation doctrine applies to the unlawful acts alleged in connection with this claim.

164.    Defendant's discriminatory acts caused Plaintiff to suffer economic damages, including lost wages, benefits, as well as emotional and physical distress.

165. Defendant acted with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

166. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees, costs and disbursements and other appropriate relief.

**COUNT VI**
**VIOLATION OF TITLE VII – QUID PRO QUO HARASSMENT**

167. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

168. Plaintiff is a female part-time faculty member at the University and was subjected to quid pro quo harassment.

169. Plaintiff was subjected to unwelcome sexual conduct by her supervisor.

170. Plaintiff's reaction to the unwelcome conduct was used as the basis for decisions affecting her employment, including her compensation, workload, job benefits, and other terms and conditions of her employment.

171. Defendant is strictly liable in this case because the harasser was Plaintiff's supervisor and exercised supervisory authority over Plaintiff and took tangible employment action against her.

172. Defendant is also liable because the decision-makers within the Department adopted Professor Roe's retaliatory animus and failed to investigate Professor Roe's decision to reduce the course enrollment or to interview Plaintiff about her reduced workload.

173. Defendant's discriminatory acts caused Plaintiff to suffer economic damages, including lost wages, benefits, as well as emotional and physical distress.

174. Defendants acted with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

175. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees, costs and disbursements and other appropriate relief.

## COUNT VII
## VIOLATION OF TITLE VII – RETALIATION

176. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

177. Plaintiff engaged in protected activity when she complained to Professor Roe and to the Title IX/EEO Office that he was sexually harassing her and also that he had retaliated against her for rebuffing his advances.

178. The protected activity was known to Defendant, including to the Title IX/EEO Office, each time Plaintiff reported it and known or should have been known by Departmental leadership based on Professor Roe's known ongoing scheme of sexual harassment.

179. Defendant subjected Plaintiff to materially adverse employment actions, including by reducing her workload, pay, and access to benefits, by removing her from an outside brand partnership, by removing her from Defendant's website, by promoting Plaintiff's harasser during the course of the Title IX investigation, by failing to address, train, supervise, monitor, discipline, and sanction Plaintiff's harasser in a timely manner, by taking far more than the 120 days recommended by the University's own policies to investigate, and by otherwise failing to conduct a prompt, timely, and thorough investigation into all of Plaintiff's allegations of misconduct, including with respect to the retaliation she faced.

180.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees, costs and disbursements and other appropriate relief.

<u>**COUNT VIII**</u>
**VIOLATION OF TITLE IX – DELIBERATE INDIFFERENCE TO**
**"PRE-ASSAULT" SEXUAL HARASSMENT AND HOSTILE WORK ENVIRONMENT**

181.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

182.    Defendant is and was, at all relevant times, a recipient of federal funding.

183.    Defendant was deliberately indifferent to known acts of sexual harassment and to the hostile working environment that was riddled with conduct so severe, pervasive, and objectively offensive since at least 2017.

184.    Defendant had actual knowledge of Professor Roe's harassment against female students and faculty since at least 2017, and again in 2019, 2020, 2021-2022, and failed to take appropriate corrective action, even though prior complaints had been made to the appropriate person with authority to take corrective action.

185.    Defendant's response to the known acts of harassment was clearly unreasonable in light of the known circumstances.

186.    Plaintiff subjectively perceived her working environment to be hostile or abusive.

187.    In addition, the environment was objectively hostile or abusive, because it was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe, pervasive, and objectively offensive to alter the conditions of Plaintiff's working environment.

188. Given the continuous nature of the discriminatory, gender-biased manner that Defendant treated Plaintiff, the continuing violation doctrine applies to the unlawful acts alleged in connection with this claim.

189. At all relevant times, Defendant maintained a policy of deliberate indifference to sexual harassment, which created a heightened risk of sexual harassment and ultimately led to the sexual harassment of Plaintiff.

190. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of Title IX, including back pay, front pay, compensatory damages, nominal damages, attorneys' fees, costs, and other appropriate relief.

**COUNT IX**
**VIOLATION OF TITLE IX –**
**"POST ASSAULT" DELIBERATE INDIFFERENCE**

191. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

192. Plaintiff complained about sexual harassment to the University's Title IX/EEO Office in or about February 2022, specifically to Rhonnie Jaus, Vice President for Equal Employment Opportunity, Affirmative Action, and Compliance, and Title IX Coordinator and Gene Puno-DeLeon, the University Associate Director of Title IX/EEO.

193. Therefore, Defendant had actual knowledge of Plaintiff's complaint of sexual harassment.

194. Despite the egregious nature of the Plaintiff's allegations perpetrated by a known serial harasser, Defendant was deliberately indifferent to Plaintiff's complaint and its response was clearly unreasonable, as it failed to take corrective action by doing nothing in response to Plaintiff's

complaint for four months, subjecting Plaintiff to further discriminatory treatment, retaliation, and lost career opportunities.

195.    Defendant's own policies required it to take prompt action immediately upon receiving a complaint.

196.    However, Defendant purportedly launched its investigation in June 2022, four months after Plaintiff first made her complaint.

197.    Furthermore, while the Defendant's investigation was pending, the perpetrator was publicly promoted to program director, sending the message to Plaintiff that the Defendant had not taken her complaint seriously.

198.    Defendant has expressed a deep-seated gender bias against female complainants of sexual harassment. For instance, in November 2022, while the University's investigation was pending, the University's General Counsel's office expressed hostility to sexual harassment complaints. Similarly, the University's Title IX/EEO Office expressed hostility toward Plaintiff in chastising her for not promptly following up with their offices following her February 2022 complaint.

199.    Despite numerous complaints against the perpetrator prior to Plaintiff's, the University's investigation took seven months, far more than the 120 days recommended by the University's own policies. The Defendant further violated Plaintiff's rights by failing to provide her a notice of allegations, to give her equal access to the evidence in the case, and by failing meaningfully to investigate Plaintiff's retaliation and quid pro quo claims against Professor Roe.

200.    The Defendant's delayed response and protracted and incomplete investigation resulted in ongoing harm to the Plaintiff throughout the Spring of 2022 and thereafter, including Professor Roe's refusal to communicate with Plaintiff, his removal of her from important projects,

his negative statements about Plaintiff to other faculty, Plaintiff's removal from the University website, and her reduced course load, pay, and missed opportunities for important job benefits.

201.    The Defendant's response was one of deliberate indifference and was clearly unreasonable in light of the known circumstances.

202.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of Title IX, including back pay, front pay, compensatory damages, nominal damages, attorneys' fees, costs, and other appropriate relief.

<u>**COUNT X**</u>
**VIOLATION OF TITLE IX – QUID PRO QUO HARASSMENT**

203.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

204.    Plaintiff is a female part-time faculty member at the University and was subjected to quid pro quo harassment.

205.    Defendant is liable because the harasser was Plaintiff's supervisor whose input decision-makers relied on to take tangible employment action against Plaintiff.

206.    Plaintiff's reaction to the unwelcome conduct was used as the basis for decisions affecting her employment, including her compensation, workload, job benefits, and other terms and conditions of her employment. For example, Plaintiff's work load was reduced in the Spring of 2022 as a result of her rejection of Professor Roe's advances.

207.    Defendant is strictly liable in this case because the harasser, Professor Roe, was Plaintiff's supervisor and exercised supervisory authority over Plaintiff and took tangible employment action against her.

208. Defendant is also liable because the decision-makers within the Department adopted Professor Roe's retaliatory animus and failed to investigate Professor Roe's decision to reduce the course enrollment or to interview Plaintiff about her reduced workload.

209. Defendant's discriminatory acts caused Plaintiff to suffer economic damages, including lost wages, benefits, and educational and workplace opportunities.

210. Defendant's discriminatory acts caused Plaintiff to incur expectation damages, including the wages she would have earned by teaching the BYOF course in the Spring of 2022, as well as the job benefits, such as healthcare and the University's contribution to her retirement account.

211. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of Title IX, including back pay, front pay, compensatory damages, including nominal damages and expectation damages, attorneys' fees, costs, and other appropriate relief.

## COUNT XI
## VIOLATION OF TITLE IX – RETALIATION

212. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

213. Plaintiff engaged in protected activity when she reported her sexual harassment to her harasser in March and December of 2021, as well as to the Title IX/EEO Office in February, May, and June of 2022.

214. The protected activity was known to Defendant, including to the Title IX/EEO Office, and to Departmental leadership who knew or should have known based on Professor Roe's known ongoing scheme of sexual harassment.

215. Defendant subjected Plaintiff to materially adverse employment actions, including by reducing her workload, pay, and access to benefits, by removing her from an outside brand partnership, by removing her from Defendant's website, by promoting Plaintiff's harasser during the course of the Title IX investigation, by failing to address, train, supervise, monitor, discipline, and sanction Plaintiff's harasser in a timely manner, by taking far more than the 120 days recommended by the University's own policies to investigate, and by otherwise failing to conduct a prompt, timely, and thorough investigation into all of Plaintiff's allegations of misconduct, including with respect to the quid pro quo harassment and retaliation she faced.

216. Furthermore, Plaintiff suffered retaliation when Defendant failed meaningfully to investigate her quid pro quo and retaliation complaint against Professor Roe.

217. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of Title IX, including back pay, front pay, compensatory damages, nominal and expectation damages, attorneys' fees, costs, and other appropriate relief.

<u>**COUNT XII**</u>
**NEGLIGENCE, NEGLIGENT SUPERVISION, NEGLIGENT RETENTION**

218. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

219. The Defendant owed a duty of care to Plaintiff both prior to and after Plaintiff complained of sexual harassment against Professor Roe because Defendant had a special relationship with Plaintiff, as Plaintiff was a prime target of Professor Roe's sexual harassment, the Department knew or should have known that Plaintiff was being sexually harassed, and the University had an obligation to act reasonably once Plaintiff reported the misconduct.

220. Professor Roe was an employee of the Defendant at all relevant times.

221. Defendant knew or should have known of Professor Roe's propensity for the gender-based misconduct alleged in this complaint, as multiple employees or students alerted high-ranking University officials to Professor Roe's misconduct prior to and during Plaintiff's employment. Consequently, Defendant owed a duty to Plaintiff.

222. Defendant breached its duty of care to Plaintiff by negligently handling multiple prior complaints against Professor Roe and for failing to prevent, cease, or remedy the gender-based misconduct that Plaintiff experienced.

223. Defendant also breached its duty of care to Plaintiff when it negligently handled its investigation of Plaintiff's allegations against Professor Roe, by delaying the investigation in violation of its own policies and the law, by engaging in a protracted investigation, by failing to conduct a full investigation into all of Plaintiff's allegations, and by failing to prevent further retaliation and discriminatory treatment of Plaintiff, and by continuing to employ and even to promote Professor Roe during the course of the Defendant's investigation into Plaintiff's complaint.

224. The tortious conduct occurred on Defendant's premises or through its chattels.

225. As a direct and proximate result of the Defendant's negligence as alleged herein, Plaintiff incurred, and will for the foreseeable continue to incur, medical expenses, lost earnings, lost educational opportunities, and other damages and expenses.

## PRAYER FOR RELIEF ON CLAIMS

WHEREFORE, Plaintiff prays that this Court:

A. Award Plaintiff all of her damages under the NYCHRL, NYSHRL, and Title VII, including back pay, front pay, compensatory damages, and punitive damages in an amount to be determined at trial;

B.    Award Plaintiff all of her compensatory damages, including nominal and compensatory damages, under Title IX;

C.    Award Plaintiff all damages for mental pain and anguish and severe emotional distress, according to proof;

D.    Award Plaintiff all attorneys' fees, costs, and expenses available under law;

E.    Award Plaintiff all pre-judgment interest and post-judgment interest available under law; and

F.    Award Plaintiff such additional and further relief as this Court may deem just and proper.

**VI.  JURY DEMAND**

Plaintiff demands a trial by jury on all issues triable of right by jury.

Respectfully submitted,

Dated: New York, New York
      March 21, 2024

**THE FIERBERG NATIONAL LAW GROUP, PLLC**

By:_____
Olympias Iliana Konidaris
305 Broadway, Seventh Floor
New York, New York 10007
Phone: (347) 504-0220
Fax: (231) 252-8100
ikonidaris@tfnlgroup.com